117 So.2d 817

Leonie Medlenka GUENO et al.

v.

Leon MEDLENKA et al.

No. 44672.

Feb. 15, 1960.

Shotwell & Brown, Monroe, for defendants-appellants.

Liskow & Lewis, Lake Charles, Joseph S. Gueno, Jr., Crowley, for plaintiffs-appellees.

McCALEB, Justice.

This is a suit for a declaratory judgment. Plaintiffs, Leonie Medlenka Gueno, Albert J. Gueno, Jr. and Donald J. Gueno, and their mineral lessee, Charles B. Wrightsman, seek a declaration that Leon Medlenka, who owns a usufruct on part of their land, has no right or interest in the oil, gas or other minerals thereunder and, therefore, was without authority to grant a mineral lease to the other defendant, Bryant A. Fehlman.

The land in question, some 600 acres situated in Acadia Parish, was owned by Mrs. Leonie Greneaux Medlenka prior to her death on February 3, 1949. In her will, she made the following disposition:

"To my grandsons, Albert, Jr., Donald Gueno and Robert Gueno to share and share alike I give my farm, known as the South Farm consisting of about 600 acres. The usufruct of said farm I give to my daughter Leonie & Son Leon to share equally for their lifetime."

Following the vesting of interests in accordance with the will, Leonie Medlenka Gueno inherited a fractional naked interest in the property from her son, Robert Gueno, who predeceased her, with the result that her usufruct on that interest was extinguished by confusion. Subsequently, during 1954, Mrs. Gueno renounced her remaining usufruct on the 600 acres and retained only the interest in fee.

On October 25, 1955, defendant Leon Medlenka and Albert and Donald Gueno entered into an agreement whereby the former exchanged his one-half interest in the usufruct of the entire 600 acres for the full usufruct of the south half of the "arable lands" contained in the tract, totalling 229.7 acres, and the Guenos became vested with a perfect ownership of the northern portion of the "arable lands" in the tract, totalling 229.4 acres.[1] Moreover,

---

1. The balance of the 600-acre tract was not included in or affected by this agreement.

the agreement contained a specific reference to the mineral rights of the parties, as follows:

> "Notwithstanding anything to the contrary herein contained the rights of the parties thereto to the oil, gas, sulphur and other minerals in and under and that may be produced from the entirety of the above described land shall not be affected by the execution of this instrument." [2]

Mrs. Leonie Medlenka Gueno intervened in the instrument and agreed that she would accept rental due her for her interest in the property from that portion of the tract received by the Guenos and thereby relieve Medlenka's portion from any obligation to her during the life of the usufruct.

On November 19, 1956 the Guenos executed an oil, gas and mineral lease on the entire property in favor of co-plaintiff, Charles B. Wrightsman, for a cash consideration of $15,000. The primary term of the lease was three years, with annual delay rentals of $25 per acre during the term.

One year later Leon Medlenka executed an oil, gas and mineral lease on the same property in favor of the other defendant, Bryant A. Fehlman, for a recited sum of "$100 and other valuable consideration." This lease had a primary term of two years, with annual delay rentals of $500. Both leases provided the usual 1/8th royalty in the event of production from the land as a result of operations conducted by the respective lessees. However, at the time of the filing of this suit, there had never been any oil, gas or other minerals produced from the land.

In their petition, plaintiffs prayed for judgment decreeing (1) that the usufructuary had no interest in the minerals on, under, or to be produced from the land in question, (2) that the lease executed by him be ordered cancelled, and (3) that the lease executed by the Guenos in favor of plaintiff Wrightsman be decreed valid.

Conversely, defendants prayed in their answer for judgment (1) recognizing the exclusive right of Leon Medlenka to lease the lands in question for mineral development and to retain all bonuses, delay rentals, and royalties accruing under such leases, (2) maintaining the Fehlman lease, and (3) decreeing the Wrightsman lease of no effect and ordering it cancelled.

---

**2.** One of the contentions of defense counsel is that the provision above quoted evinces the intent of the parties that Medlenka, the usufructuary, was vested with the mineral rights; that he was asserting them and was not releasing them as to any portion of the lands upon which his usufruct was otherwise being relinquished. This contention has no merit and the trial judge correctly rejected it on the ground that the provision relied on by counsel simply shows the intent of the parties that their respective legal rights of exploration and mineral development were to remain unaffected by the agreement.

After a trial the district judge, in a well-considered opinion, sustained plaintiffs' position and rendered judgment in their favor. However, he decreed that the oil, gas and mineral lease granted by the Guenos to Wrightsman was subordinate to the usufructuary rights which Medlenka had retained under the contract of October 25, 1955; that, as to the surface of the lands subject to his usufruct, Wrightsman had no right of entry for exploration purposes but that he was, nevertheless, entitled to extract the minerals lying under the land by directional drilling.

Defendants prosecuted this appeal from the adverse decision. Plaintiffs have answered, contending that the lower court's judgment is incorrect insofar as it decreed that the rights of its lessee are subordinate to the rights of the usufructuary. In the alternative, plaintiffs assert that it should be held that the lessee has the rights of entry and use to all of the surface without the consent of the usufructuary, so long as the exercise of those rights does not unreasonably interfere with the use of the land by the usufructuary and that the only liability which the lessee might have to the usufructuary would be for damages caused by unreasonable interference.

From the foregoing, it is seen that this case presents for decision the question of the respective interests of a usufructuary and a naked owner in undiscovered oil, gas and other fugacious minerals under the land subject to the usufruct and also as to which one, if either, has the right to lease the property for purpose of exploration for and production of oil, gas and other minerals.

Initially, it must be determined whether the creation of a usufruct on land carries with it a right in the usufructuary to search for and reduce to his possession the oil and gas which may lie under the surface. Article 533 of the Civil Code defines usufruct as follows:

> "Usufruct is the right of enjoying a thing, the property of which is vested in another, and to draw from the same all the profit, utility and advantages which it may produce, *provided it be without altering the substance of the thing.* (Italics ours.)

> "The obligation of not altering the substance of the thing takes place only in the case of perfect usufruct."

The usufruct of land is specifically designated by Article 534 of the Civil Code to be a perfect usufruct.[3] Since minerals

---

3. Article 534 says that there are two kinds of usufruct: "Perfect usufruct, which is of things which the usufructuary can enjoy without changing their substance, though their substance may be diminished or deteriorated naturally by time or by house, a piece of land, furniture and other the use to which they are applied; as a movable effects.

such as oil and gas are a part of the land itself (see Federal Land Bank of New Orleans v. Mulhern, 180 La. 627, 157 So. 370, 95 A.L.R. 948), it follows that they cannot be used by a usufructuary of land if such use will alter their substance. However, oil and gas have no use unless their substance is altered and, therefore, it is apparent that the usufructuary of land cannot use any oil or gas which exists under the land, and by a parity of reasoning, he does not have the right to explore for these minerals and withdraw them from the land. The usufructuary of land, having only a perfect usufruct, has only the right to the natural fruits of the land and such civil fruits as are described and treated in Articles 544 through 554 of the Civil Code. The right to consume the substance of the land is not permitted, save in the exceptional instance hereinafter pointed out.

Article 551 of the Civil Code declares, in substance, that the usufructuary has the right to draw all the profits which are usually produced by the thing subject to the usufruct; he may cut trees on the land or take from it earth, stones, sand and other material for his own use pro-vided he acts as a prudent administrator and does not abuse the right accorded. However, Article 552, which the trial judge found applicable to the case, restricts the right of the usufructuary to the enjoyment and proceeds of mines and quarries in the land subject to the usufruct " * * * if they were actually worked before the commencement of the usufruct; but he has no right to mines and quarries not opened".

■ That exploration for oil and gas is mining within the meaning of our law is no longer an open question. See Elder v. Ellerbe, 135 La. 990, 66 So. 337 and Jackson v. Shaw, 151 La. 795, 92 So. 339. Indeed, in the original opinion in Gulf Refining Co. v. Garrett, 209 La. 674, 25 So.2d 329, 332, it was held that the provisions of Article 552 of the Civil Code are applicable to the production of oil and gas. The views therein, relative to the phase of the case now under consideration, were ably expressed by our late Chief Justice Charles A. O'Niell and we are convinced of their soundness. We, therefore, adopt them as far as may be pertinent to the case at hand.[4]

"And imperfect or *quasi* usufruct, which is of things which would be useless to the usufructuary, if he did not consume or expend them, or change the substance of them, as money, grain, liquors."

4. A rehearing was granted in Gulf Refining Co. v. Garrett, which automatically set aside the original decree and, thereafter, the case was remanded to the trial court for the taking of further evidence. A portion of the original opinion in that case, declaring that a mineral lease vests substantive real rights in the lessee, has been declared to be contrary to the jurisprudence of this Court. See Milling v.

"* * * The shallow wells drilled by the Ohio Oil Company on the 20 acres were producing oil previous to and at the time of the death of John L. Garrett. They were producing there only small quantities of oil and produced very little if any oil after his death. As the wells of the Ohio Oil Company were in operation at the time when the usufruct in favor of the widow of John L. Garrett was created, it is not disputed that she was entitled, as usufructuary, to any royalties owed by the Ohio Oil Company for oil produced thereafter under that lease; because, under Article 552 of the Civil Code, a usufructuary has a right to the proceeds of an oil well on the land subject to the usufruct, if the well was already drilled and producing oil at the time when the usufruct was created or established. It is so provided in article 552 of the Civil Code, thus: 'The usufructuary has a right to the enjoyment and proceeds of mines and quarries in the land subject to the usufruct, if they were actually worked before the commencement of the usufruct; but he has no right to mines and quarries not opened.'

Collector of Revenue, 220 La. 773, 57 So.2d 679. However, the quoted views above expressed respecting the nature of mineral operations, and the applicability

"That article is in harmony with the proviso in article 533 of the Civil Code, defining usufruct, thus: 'Usufruct is the right of enjoying a thing, the property of which is vested in another, and to draw from the same all the profit, utility and advantages which it may produce, *provided it be without altering the substance of the thing.*'

"In the case of Elder v. Ellerbe, 135 La. 990, 66 So. 337, it was held that the right of a possessor of land in good faith to retain the 'products' of the land, under Article 502 of the Civil Code, or to retain the 'fruits', under article 3453, if evicted by a plaintiff proving his ownership of the land, did not give the possessor in good faith the right 'to extract the mineral oil and gas from the land and retain the proceeds.' In so deciding it was declared that the right of the possessor in good faith in such a case, under articles 502 and 3453 of the Civil Code, 'cannot be greater than the right of a usufructuary', and that a usufructuary had no right to open a mine, and hence no right to drill an oil or gas well, and to appropriate the proceeds to his own use, if the mine was not opened or the well not drilled

of Article 552 of the Civil Code to a case like this, conforms, as we have stated, to the views we entertain.

at the time of the creation or establishment of the usufruct. That decision was affirmed in Jackson v. Shaw, 151 La. 795, loc. cit. 799, 92 So. 339, loc. cit. 341, where it was held that the defendant, even though he possessed the land in good faith, was obliged to account to the plaintiff, as owner of the land, for the oil produced therefrom by the defendant. The court declared: 'And the fact is that, even if he had possessed in legal as well as actual good faith, he still would owe this accounting; since oil and other minerals taken from the land by a possessor in good faith continue to belong to the owner of the land, and therefore must be restored to this owner along with the land—unlike in that respect to fruits, which pass into the ownership of the possessor in good faith as soon as reduced to possession by him. Elder v. Ellerbe, 135 La. 990, 66 So. 337.'

"The ruling in Elder v. Ellerbe and in Jackson v. Shaw, that the production of mineral oil and gas is a mining operation, and the statement that it therefore comes under the provisions of article 552 of the Civil Code, referring to mines and quarries, is founded upon the several statutes declaring that the production of mineral oil or natural gas is a mining operation. We refer particularly to Section 2 of Act 144 of 1908 and to Section 2 of Act 254 of 1910, declaring that the supervisor of minerals shall see that all of the laws pertaining to *mining, particularly those pertaining to the drilling of wells and the piping and consumption of natural gas and oil,* are faithfully carried out.

"In the case of Etchison Drilling Co. v. Flournoy, 131 La. 442, 59 So. 867, 869, after a review of the statutes on the subject, it was declared: 'From the above summary of the laws of 1908 and 1910, all referring to the subject of minerals, gas, oil, etc., we are forced to the conclusion that the Legislature has now classified oil and gas as minerals; and (has declared) those who are engaged in extracting them from the earth to be engaged in mining pursuits.'

"And near the end of the opinion rendered in that case, the court, referring to Act 196 of 1910, declared: 'In view of the language used, we are constrained to hold the production of oil to be a mining pursuit' ". (All emphases supplied by the author of the opinion.)

Counsel for defendants contend that Article 552 does not apply to oil and gas explorations for the reason that such pursuits were unknown at the time of the adoption of the Civil Code. From this premise they assert that the appropriate

codal articles are Article 555, which expressly grants the usufructuary the power to execute leases; Article 544, vesting the usufructuary with ownership of natural and civil fruits and Article 549, granting the usufructuary unconditional power to alienate property that is subject to an imperfect usufruct.

We are not impressed with counsel's argument that Article 552 is inapplicable to oil and gas mining for, aside from the fact that it has already been held otherwise, it is well known to the bench and bar and those engaged in the oil industry that this Court has consistently applied, as far as it has been able to logically do so, the provisions of the Civil Code in the determination of mineral cases. See Milling v. Collector of Revenue, supra, and the many cases there cited.

Article 549, upon which counsel also rely, has no relevance to this case. That article applies to imperfect usufructs whereas, as heretofore shown, we are here concerned with a usufruct of land—a perfect usufruct.

Article 555 is likewise without pertinence here as that provision permits the usufructuary to enjoy "or lease to another, or even sell or give away his right; * * * ". In this case, as specifically stated in Article 552, the usufructuary has no right to the enjoyment of proceeds of mines and quarries not open. Hence, he may not lease that to which he is without right.

Articles 544 and 545, depended on by counsel, declare that the natural and civil fruits of the thing subject to the usufruct belong to the usufructuary and also confer upon him ownership of the produce, the rents and revenues of the land. But, here again, there must be excluded, from the fruits and products to which the usufructuary is entitled (see also Articles 547 and 551), the products derived from mines which are not opened before the commencement of the usufruct, as they are expressly excepted by Article 552. This is recognized by the well-respected French Commentator, Planiol, in Vol. 1, No. 2794 of his Traité Élémentaire De Droit Civil, as translated by the Louisiana Law Institute, in commenting on Article 598 of the Code Napoleon, which is substantially identical with our Article 552. He observes:

"What is extracted from a mine or quarry is not a product of the soil. No earth produces a mineral, sand or limestone. It is the soil itself that is taken out and sold piece by piece. The exploitation of a mine or quarry leads inevitably to its exhaustion. Nevertheless, on account of the abundance of materials, the custom is to look upon what is withdrawn as a product. This is what the Code does. It classifies these products as fruits. It attributes them to usufructuaries

because they are income upon which owners live. (Art. 598.)

"The law however imposes a condition to the granting of this right to usufructuaries. It is the same as the one already mentioned in connection with tall forest trees. The mine or quarry must already have been opened before the commencement of the usufruct. Usufructuaries may therefore continue an exploitation that has already begun. They may not themselves start it when it has not yet been commenced."

Being of the opinion that the usufructuary is without right to the minerals which may be produced from the land subject to the usufruct after it has commenced, the next question to be determined is whether the naked owner has the right to search for the minerals during the existence of the usufruct and to reduce them to his possession.

We think that Article 552, in withholding from the usufructuary any right to mines and quarries not opened, necessarily recognizes that the naked owner retains, as an incident to his ownership, the right to open a new mine on the land subject to the usufruct and to the products derived from the mining operations. This is indicated by Planiol in No. 2795, Vol. 1 of the Treatise above referred to. He says:

"Art. 598, as drafted in 1804—and its text has not been amended since

then—applies the same rule to mines as it does to quarries and pits. The same text is used and all are mentioned together. Consequently, usufructuaries enjoyed the income of mines that were already in operation the day of the opening of their rights. And they could not undertake the exploitation of any new mine. But the law of April 21, 1810 has entirely changed the system of the exploitation of mines. They can no longer be opened, *even by the owner of the surface*, except in virtue of a governmental permit * * *". (Italics ours.)

Again, in dealing with the obligation of the usufructuary to respect the owner's habits, Planiol states in No. 2819, Vol. I, under the sub-heading "Exploitation of Quarries and Pits", that the usufructuary cannot exploit deposits of materials classified as quarries, pits, or turbaries except when their exploitation had already commenced when his usufruct opened. He continues, in the next paragraph, as follows:

"According to the Civil Code the same rule applies to mines. *At the time of its compilation owners themselves had the right to exploit mines contained within the perimeter of their lands.* But Art. 598 is implicitly amended, as regards mines, by the law of April 21, 1810 which created the franchise system. The owner himself could not work the mine. And the

usufructuary, on the other hand may obtain the concession to do so, just as could any other citizen. And if he does, he will exploit the mine as a concessionnaire and not as usufructuary. The mine, upon which he has obtained a concession will remain in his hands as an immovable distinct from that upon which he has a usufruct." (Italics ours).

■ Thus, it is seen that the right of the owner to explore for minerals remains unaffected by the fact that the land is burdened with a usufruct,[5] save and except that these rights may not be exercised in a manner detrimental to the usufructuary's right of possession and use. Hence, we approve the ruling of the district judge that the plaintiffs' lease to Wrightsman is valid and enforceable.

The judge, while upholding plaintiffs' mineral lease, declared that their lessee's rights were subordinate to the usufructuary rights of Medlenka, in view of the obligations imposed on the landowners, set forth in Section 4 of Chapter 1 of Title III of the Civil Code, Articles 599 et seq., and he therefore decreed that the lessee could not enter on the surface of the land subject to the usufruct without first obtaining Medlenka's consent.

In their answer to the appeal plaintiffs complain of this ruling and we believe that there is merit in their contention that the subordination of the exercise by plaintiffs of their rights to the usufructuary's right of possession and enjoyment of the land may well be contrary to our public policy. It is true, of course, that the Civil Code imposes upon the owner the following obligations: to deliver the thing to the usufructuary (Article 599); that he must neither interrupt nor in any way impede the usufructuary in the enjoyment of the property or impair his rights (Article 600); that, while he may make alterations on the premises, he must not do so in such a way as to worsen the condition of the usufructuary (Article 601); that he may not create any new servitude on the property unless it be done in such a manner as to be of no injury to the usufructuary (Article 603) and that, although he may sell or alienate the thing without the usufructuary's consent, he is prohibited from doing it in such circumstances as may be injurious to the enjoyment of the usufructuary (Article 605).

While the usufructuary is entitled to a substantial compliance by the owner with the aforementioned obligations, the owner has certain basic rights which he is also

5. Planiol, in No. 2827 of Vol. 1, Part 2 of his Civil Law Treatise declares: "The owner cannot either use the thing or gather its fruits. His right nevertheless reappears where that of the usufructuary stops. The latter thus is not entitled to the stumps of tall forest trees blown down by the wind or broken off by accident, if restorations are not possible. There is no doubt about the fact that these trees belong to the owner, if the usufruct does not need them. * * * "

entitled to exercise, these rights being co-extensive and concurrent with, not subordinate to, the usufructuary's right of enjoyment and use. One of the rights which the owner retains is the right of exploration for minerals. His quality as owner vests in him the right of entering the premises for certain purposes, i. e., to make alterations thereon (Art. 601) and he may even create a new servitude on the land (Art. 602) provided in each case that it be done in such a manner as to be of no injury to the usufructuary. Therefore, in entering the land for mineral exploration purposes, the owner does not become a trespasser and does not require the consent of the usufructuary in order to exercise this right. The usufructuary, not having any right to explore for minerals, is not a necessary party to a mineral lease and neither may he prevent the owner's lessee from entering the property for exploration purposes nor may he object to such explorations as long as this right is exercised in such a way as to not unreasonably interfere with his use of the land.

■■ In this connection, it is to be borne in mind that it is contrary to the public policy of this State to hold property out of commerce and this Court has consistently applied the liberative prescription of ten years in dealing with the exercise of mineral rights. Hence, it would not be reasonable to conclude that the usufructuary's consent was required in order for the owner to conduct mineral operations on the land as long as the operations do not to any substantial extent interfere with the usufructuary's enjoyment of the property—for to so hold would vest in the usufructuary a veto right not accorded by law and permit him to keep the mineral rights out of commerce during the entire life of the usufruct. In case the owner or his lessee does interfere and injures the usufructuary in his rights, "* * * he (the owner or his assignees) shall be bound to make good the losses and damages which may result". Article 601, Civil Code.

Accordingly, the judgment appealed from is amended by deleting therefrom the declaration that the oil, gas and mineral lease granted by plaintiffs to Charles B. Wrightsman is subordinate to the usufructuary rights of defendant, Leon Medlenka, and does not confer upon the lessee any rights of entry on the surface of the land subject to the usufructuary rights of Leon Medlenka without the consent of said Medlenka. In all other respects, the judgment appealed from is affirmed at defendants' costs.

HAWTHORNE, J., concurs in the decree.

HAMITER, J., did not participate.